**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 22, 2005**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

NATALIE ABRAMS, individually and on behalf of all others similarly situated; EATON VANCE HIGH YIELD MUNICIPALS TRUST,

　　　Plaintiffs,

v.

SOUTHEASTERN MUNICIPAL BONDS INC.; FIRST UNITED SECURITIES GROUP OF CALIFORNIA, INC.; MICHAEL SIEMER; GREAT WESTERN SAVINGS BANK; OVERTON & SYKES, P.C.; BORIS, KLUEGER & NEMKOV, P.C.; WATROUS EHLERS & THOMPSON; RANCHO LORRAINE LIMITED PARTNERSHIP; CALKINS, KRAMER, GRIMSHAW & HARRING, P.C.,

　　　Defendants,

FREDERIC B. O'NEAL,

　　　Appellee,

---

ROBERT T. LEGO,

　　　Attorney Lien Claimant -
　　　Appellant.

No. 02-1473
(D.C. No. 89-N-150 (CBS))
(D. Colorado)

## ORDER AND JUDGMENT[*]

Before **HENRY, HOLLOWAY** and **ANDERSON**, Circuit Judges.

_____

This is a class action filed in the United States District Court for the District of Colorado. The action alleged violations of federal securities laws and averred various state law claims as well. These claims sought monetary damages for fraud and securities law violations involving the sale of municipal bonds. There was subject matter jurisdiction under 28 U.S.C. § 1331 and Fed. R. Civ. P. 23 regarding class actions.

The instant appeal is from an order granting the motion of appellee Frederic B. O'Neal to strike a notice of attorney's lien filed by appellant Robert T. Lego. All matters involving the original parties to this case have been settled. All that remained in the district court was the matter of attorneys' fees, and most disputes relating to fees were also settled, with the exception of the lien claimed by Mr. Lego. In the memorandum and order from which this appeal by Lego has been taken, the district judge thus summed up the general nature of the issues presented on appeal: "This case has come down to a contest among lawyers concerning a division of the monies which each lawyer or law firm should receive from the proceeds paid by Defendant Michael Siemer in settlement of plaintiffs' and others'

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

claims against Siemer in this and related litigation."

This court has jurisdiction over this appeal, being an appeal from a final decision of the district court pursuant to 28 U.S.C. § 1291.

**I**

The underlying action was brought by Ms. Natalie Abrams in 1989 alleging securities fraud relating to the issuance of a 1986 special district bond issue for the Barr Lake Metropolitan District, which is located in Adams County, Colorado. The action was certified as a class action. Among the defendants in the case was one Michael Siemer, who was at first represented by Mr. Lego, the current appellant. Lego represented Siemer for approximately 18 months, after which time he moved for leave to withdraw from the representation, citing Siemer's failure to pay Lego's fees and failure to cooperate in his own defense.

In December 1991, approximately one year after Lego's withdrawal had been approved by the court, the plaintiff class took a default judgment against Siemer in the amount of $14,270,000. Primary counsel for the plaintiff class was the Pendleton firm which, beginning in 1990, also represented the plaintiffs in another federal class action ("the Denver bank case") against some of the same defendants that the Abrams class had sued. A judgment against Siemer in excess of $5.4 million was entered in that action in 1994.

In the meantime, Lego had sued Siemer in state court for his unpaid fees, and in December 1991 Lego also obtained a default judgment against Siemer. Lego then began

efforts to collect his judgment from Siemer and uncovered information which led to the discovery of substantial assets. Lego retained appellee O'Neal, a Florida attorney, to represent him in his collection efforts. Later, Lego and O'Neal joined forces with the Pendleton firm, whose interest was in collecting the two judgments the firm had obtained for the plaintiff classes against Siemer in this action and the Denver bank case. The parties eventually entered into a comprehensive agreement to govern their efforts and especially to establish priorities among the Siemer creditors. Styled "Co-Counsel and Contingency Fee Agreement" (hereinafter the Co-Counsel Agreement), it was executed in November 1998 and presented to the district court for approval under the rules pertaining to class actions. The district court approved the Co-Counsel Agreement in March 1989.

As the district court observed, the major provisions of the Co-Counsel Agreement established

> (1) the terms on which each group of plaintiffs/judgment creditors would advance costs, recover those costs, and divide the proceeds of their collection efforts, (2) the division of responsibilities between O'Neal and the Pendleton Firm, and (3) the terms on which the two law firms would share attorney fees.

II Joint App. at 519. The Agreement also included a provision requiring disclosure to the clients of the retention of and fee arrangements for any additional lawyers.

Lego was not identified in this Agreement as either a client or an attorney, but he signed as an "additional party." The Agreement recognized that Lego had incurred expenses in his efforts to collect his judgment and afforded first priority to reimbursement of those expenses. The Agreement gave similar priority to Lego over the plaintiff classes in

allocation of net proceeds after payment of expenses. The district judge noted that this "remarkable priority" was based on the "background information" Lego and O'Neal had developed and "the continued efforts Lego will make to further the interests of all parties." *Id*. at 520. Lego was also to receive a two per cent finder's fee on the clients' ultimate recovery from Siemer after costs and attorneys' fees were paid.

By the terms of the Co-Counsel Agreement, O'Neal became counsel for the class action plaintiffs/judgment creditors in their collection effort and was to have primary responsibility for the collection efforts in Florida, where Siemer assets had been identified, with the assistance of the Pendleton firm. In July 1999, Lego reached a settlement with Siemer, but Lego continued to work on the collection efforts being pursued by O'Neal and the Pendleton firm on behalf of the class action plaintiffs. Lego's continued involvement in these efforts is one of two projects for which Lego presently claims that he is entitled to recover from O'Neal, which we will refer to as the joint collection project.

Beginning in the late fall of 1999, O'Neal and the Pendleton firm began to have serious disagreements about the collection efforts in Florida, which involved the pursuit of several separate actions. The lawyers came to have different views about the likelihood of success and consequently over the extent to which they should recommend that the clients compromise their judgment claims to reach settlement. This seems to have led to serious deterioration of the relationship between O'Neal and the Pendleton firm. As a result, the Pendleton firm retained another Florida firm, the Litchford firm, to pursue settlement

negotiations with Siemer and to aid in the several cases pending in Florida state courts.

The plaintiffs reached a settlement with Siemer for $6.25 million in the spring of 2000. That settlement, however, did not resolve the simmering dispute among the attorneys. It is not necessary to relate all the machinations in detail. Mr. Lego claims that in March 2000, he and Mr. O'Neal orally agreed that Lego would represent O'Neal as his attorney in the emerging fee dispute, which we will refer to as the fee dispute project. Lego further contends that one year after the March 2000 oral agreement regarding the fee dispute project, he and O'Neal executed a memorandum memorializing their pre-existing agreement for Lego to represent O'Neal in the joint collection project. (This would have been about one year after that project had culminated in a settlement with Siemer, as noted *supra*.) That document made no mention of the alleged agreement regarding the fee dispute project. It is undisputed that O'Neal hired a different Denver attorney, Mr. Hoffman, to represent him in the fee dispute, and that Mr. Hoffman also represented Lego in that matter.

Among other issues, the court had to determine the total amount of fees to be awarded so that the remainder of the settlement proceeds could be distributed to class members. The court referred all pending motions to a magistrate judge. In November 2001, two days of testimony were heard by Magistrate Judge Shaffer on the attorneys' fees issues, which at that time primarily concerned the proportion of the proceeds to be awarded as fees and the division of that sum among the Pendleton firm, the Litchford firm, and O'Neal. Hoffman represented both O'Neal and Lego at this hearing. The parties had not finished presenting

- 6 -

their evidence after two days, and the magistrate judge set a date in January 2002 for resumption of the evidentiary hearing. In the interim, however, the Pendleton firm, the Litchford firm, and O'Neal reached an agreement as to how the fee award to be determined should be divided among them and submitted a joint application for the court's approval reflecting the terms of their agreement.

The agreement among those attorneys apparently triggered the instant dispute between Lego and O'Neal, however. On January 4, 2002, Mr. Hoffman filed a motion to withdraw from representing both, citing the emergence of a conflict between the two concerning the fee dispute. That motion was duly granted. On January 14, 2002, Lego filed his original notice of attorney's lien, which he soon amended to add a claim based on the theory of *quantum meruit*. In the amended notice, Lego alleged that he was owed over $500,000 in fees and expenses.[1] The lien was claimed only against O'Neal, not against the settlement funds which were about to be disbursed to the plaintiff class. O'Neal filed an objection to the notices of lien.

After receiving supplemental briefing by Lego and O'Neal, the magistrate judge recommended granting O'Neal's motion to strike Lego's notice of attorney's lien. Lego objected to the recommendation. The district judge issued his Order Accepting Magistrate Judge's Recommendation on September 18, 2002, and judgment was entered, followed by

---

[1]Rounded to the nearest thousand, Lego's claims were for $207,000 on the joint collection project, which included some $188,000 in fees and $19,000 in unreimbursed expenses, and $303,000 on the fee dispute project, comprising $152,000 in fees and $151,000 in expenses.

this appeal.  Because the district judge reviewed the magistrate judge's recommendation *de novo*, our review focuses on the district judge's order.

## II

The district judge first addressed what he called Lego's "overarching" objection – that the magistrate judge had deprived him of due process by recommending striking Lego's claimed lien without taking further testimony.  The judge noted that Lego had been present at the two days of evidentiary hearing before the magistrate judge and had been represented at those hearings by Mr. Hoffman.  The judge concluded that Lego did not have a plausible claim of deprivation of due process during the time that he was represented by Mr. Hoffman.

As to events occurring after that, the judge reached the same conclusion.  The judge observed that the magistrate judge had Lego's notices of lien, O'Neal's motions to strike, and Lego's responses in opposition to those motions.  In addition, the record before the magistrate judge included the testimony from the November hearing and extensive documentation.  Lego had added to that record two detailed affidavits submitted with Lego's objections to the magistrate judge's recommendations.

The district judge concluded that this record was adequate for his review and that Lego had enjoyed a meaningful opportunity to develop his case.  The judge observed:

> The only discernible utility of a further evidentiary hearing would be (1) to allow O'Neal and Lego to cross examine one another and (2) to let the court make credibility determinations based on the demeanor of the two men and on how much further damage they could inflict on one another during cross

examination. For reasons stated both in this order and in the magistrate judge's recommendations, the contemporaneous documentation of events, which the court regards as far more persuasive than Lego's or O'Neal's self-serving recollections, casts serious and irremediable doubt on the credibility of both men. In view of my disposition of Lego's objections, a continued evidentiary hearing is neither required by the Due Process Clause nor needed to develop a complete record.

II Joint App. 527.

Proceeding to the merits of the controversy, the district judge found that Lego's evidence was insufficient to prove that he had ever been an attorney for O'Neal. Lego alleged that he and O'Neal had reached an oral agreement in November 1999 for O'Neal to "fairly compensate" Lego for his services. On March 1, 2001, their agreement was reduced to writing. II Joint App. 632-35. This "letter agreement" provided for Lego to receive "fair compensation" for, *inter alia*, work done as O'Neal's "associate counsel" and work done for O'Neal, and it specified that Lego had always worked on "this project" as a "temporary 'contract lawyer'" for O'Neal and not as attorney for the plaintiff class. The district judge accepted this as the agreement between the two parties to this appeal for purposes of his analysis, although in a footnote the judge made clear that he thought the writing was really an attempt to avoid ethical problems involved in Lego representing the plaintiff class or having a fee splitting agreement with O'Neal.

The ethical pitfalls to which the judge referred arose from Lego's representation of Siemer in this case in 1989 and 1990. The judge said that if Lego had sought approval to be retained as additional class counsel the court would have been compelled to reject the

proposal for this reason, and he thus rejected "Lego's ethically obtuse attempt to argue that his representation of Siemer would be 'factually and legally distinct' and thus not 'substantially related' to" representation of the plaintiff class. Because the collection efforts were part of the same lawsuit, they were part of the "same matter" as that term is used in the applicable ethical rule.[2]

The letter agreement said that Lego would receive "fair compensation" from O'Neal, to be determined by reference to the ethical rule's guidelines for reasonable fees and with O'Neal to decide what hourly rate would be reasonable. The main problem with Lego's reliance on the letter agreement, the judge said, was "that it suffers from a critical analytical gap concerning the identity of the client. No reasonable interpretation of the facts here supports any common-sense inference that Lego was an 'attorney' who assisted O'Neal, as a 'client,' to obtain a judgment" on the joint collection project. Instead, the plaintiff classes were "the only conceivable 'clients.'" II Joint App. at 529-30. The judge noted that Lego had actually submitted a billing statement dated June 15, 2000, which specifically referred to services for the plaintiff classes and which included time spent *before* O'Neal had even been retained. Also, the judge rejected Lego's reliance on the "ancient case" of *Lathrop v. Hallett*, 77 P. 1095 (Colo. Ct. App. 1904), in which the court had held that a person in the position

---

[2]Rule 1.9(a) of the Colo. Rules of Prof. Conduct provides:
    A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

of a "contract lawyer" could not put a lien on the recovery of the party to the lawsuit for want of an attorney-client relationship and would have to look to the lawyer who hired her for her fees. The court there referred to the hiring, primary lawyer as the "client," language on which Lego relied, but the judge termed that *obiter dicta*.

The court then moved on to Lego's claim for fees for work purportedly done for O'Neal in the fee dispute project. Lego claimed just over $300,000 in fees for this work. The judge noted that the evidence of the existence of such an agreement was "in sharp conflict." Because of the "contradictions, evasions, and half-truths" in their statements and claims, neither man had any credibility with the magistrate judge, or with him, the judge said. Studying the evidence as a whole, the judge found the evidence of an agreement wanting. First, he found it "raises eyebrows" for two attorneys who were already in the middle of a fee dispute to have only an oral agreement under which one was to provide legal services to the other. Second, there was a "scarcity of objective evidence" to support the quantity of work Lego claimed to have performed in this aspect of the matter. O'Neal had counsel of record in the fee dispute, after all, and that was Hoffman. Also, before retaining Hoffman, O'Neal had submitted two filings pro se. The judge found Lego's evidence to be sketchy and ambiguous and therefore insufficient.

## III

We first consider O'Neal's contention that this appeal is now moot. In an affidavit submitted in an appendix to his brief, O'Neal states that, as a result of Lego's failure to

obtain a stay of the award of attorneys' fees, the fees have been paid from the settlement proceeds. He asserts that there is consequently "no money, property, choses in action, or claims and demands" to which a lien could attach.

Mr. Lego, in turn, protests that Mr. O'Neal has acted improperly by submitting this affidavit because it was not in the record before the district court when that court issued the judgment from which Lego has appealed. This contention is meritless. Although of course the principle cited by Lego is a cornerstone of appellate procedure, O'Neal's submission comes within an exception to that fundamental rule. Mootness is a matter of jurisdiction and may, in proper circumstances, be raised in this manner:

> Of course it is proper for a party to provide additional facts when that party has an objectively reasonable, good faith argument that subsequent events have rendered the controversy moot. Indeed, we depend on the parties for such information, and it is axiomatic that subsequent events will not be reflected in the district court record.

*Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1309 (10th Cir. 2000).

So, we turn to the merits of Mr. O'Neal's argument that this matter is now moot.

> Because "the existence of a live controversy is a constitutional prerequisite to federal court jurisdiction," the court must determine whether a case is moot before proceeding to the merits. "A case is moot when issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." The crucial question is whether "granting a present determination of the issues offered . . . will have some effect in the real world." "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." The parties must continue to have a personal stake in the outcome throughout the case.

*Citizens For Responsible Government v. Davidson*, 236 F.3d 1174, 1181-82 (10th Cir. 2000)

(internal citations omitted).

As reflected in *Davidson*, as a general rule an interest in attorneys' fees will not satisfy the case or controversy requirement where the underlying claim has become moot. 236 F.3d at 1183. This general rule must be applied with caution, however, because it is limited by the principle that "'the expiration of the underlying cause of action does not moot a controversy over attorney's fees already incurred.'" *Id.* (quoting *Dahlem v. Board of Education*, 901 F.2d 1508, 1511 (10th Cir. 1990)). In the instant case, even Mr. O'Neal's challenge to our jurisdiction recognizes that this is a case of the second type, one in which there is – or at least was – a live controversy over fees alleged to have been already incurred. The contention of mootness is focused much more narrowly on the fact that Mr. Lego has claimed the benefit of a charging lien under Colorado law and the fact that the district court has since approved the disbursement of fees in accordance with its prior orders so that there is no longer a fund in court to which the lien might attach.

No authority is cited for O'Neal's argument that this matter is moot, except for the applicable attorney's lien statute, Colo. Rev. Stat. § 12-5-119, and *Davidson*. These authorities are cited only for general propositions and do not address the specific issue presented here. Arguing that this controversy is not moot, Lego cites *Out of Line Sports, Inc. v. Rollerblade, Inc.*, 213 F.3d 500 (10th Cir. 2000), which was an appeal from an order to enforce an attorney's lien. In that case, the party opposing the lien claimant had acquiesced in the release of the funds against which the lien had been asserted. We held that the appeal

was moot because the party had voluntarily acted to effect the release of the funds, going beyond what had been required by the district court's rulings. We said that "[t]he test of whether an appeal is moot is whether the party acted voluntarily or because of the actual or implied compulsion of judicial power." *Id*. at 502.

In the instant case, Lego asserts that he did not perform any act analogous to that of the appellant in *Out of Line Sports* and that his appeal is therefore not moot. We agree that the distinction between that case and this one is material. We could not hold this appeal moot based on that authority. There remains, however, the larger question whether this court could provide meaningful relief to the appellant under the circumstances.

We conclude that the appeal is not moot because equitable relief is available should appellant prevail on the merits. Because O'Neal accepted the funds with notice of Lego's claimed lien, under Colorado law O'Neal may be liable for enforcement of Lego's claim on equitable principles. *See In re Marriage of Smith*, 687 P.2d 519 (Colo. Ct. App. 1984); *Berger v. Dixon & Snow, P.C.*, 868 P.2d 1149, 1154 (Colo. Ct. App. 1994) ("an attorney who accepts fees with the knowledge that the award on which those fees depend could be later reversed, vacated, modified, or otherwise set aside may be ordered to restore the fees").

**IV**

Lego's first contention on the merits is that he was deprived of due process because the district court did not hold an additional evidentiary hearing at which he could have testified. Lego's characterization of the court's decision not to hear testimony as a denial of

due process is hyperbolic.

The procedures for summary judgment in civil cases are but one example of the principle that due process does not always require that the court hear direct, live testimony from every litigant. A district court's decision whether to conduct hearings in order to resolve motions – even those which are vigorously disputed and may directly determine the outcome of the litigation – is reviewed for abuse of discretion. *See Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 854 (10th Cir. 1999) (decision to exclude evidence at the summary judgment stage reviewed for abuse of discretion like other evidentiary rulings).

To determine whether the district judge abused his discretion, we must inquire into what Lego contends that his evidence would have shown. Lego's briefs provide only limited assistance in this crucial inquiry. We do understand, nevertheless, that Lego's contentions include matters covered in the affidavits he submitted to the trial court and issues discussed later in this opinion as well. But it is of no force at all to assert, as Lego does, that neither the magistrate judge nor the district judge heard any testimony directly from "any of Lego's witnesses,"[3] when we are given nary a hint as to the identity of the witnesses, much less a proffer as to the testimony that Lego would have elicited from them. This issue is very similar to a ruling at trial excluding evidence, and Lego would have done well to note the requirement of an offer of proof under Fed. R. Evid. 103(a).

We conclude from examination of Mr. Lego's prolix affidavits that he submitted at

---

[3]Opening Brief of Appellant at 17.

various times to the district court and from the sparse suggestions in his appellate briefs that his testimony would have added little and, as the district judge indicated, would likely not have carried great weight. The record shows that Lego and O'Neal have offered several explanations for their relationship. There are too many inconsistencies and contradictions for any testimony to have resolved. We conclude that Lego's positions could not have been significantly advanced by further evidentiary hearings; at least it is impossible for us to conclude otherwise on this record.

## V

Mr. Lego further contends that the district court erred in concluding that he was actually representing the plaintiff class in his efforts on the joint collection project. Lego strenuously urges that he never intended to represent the class and that the district court should have accepted the memorandum of agreement which he and O'Neal executed (and other evidence he cites) as proof that Lego did indeed represent O'Neal instead.

Reviewing the district judge's analysis and holding in the particular circumstances presented, we conclude that no abuse of discretion has been shown. Abuse of discretion is the proper standard of review because the ruling at issue was one declining to grant equitable relief.[4] We hold that it was not an abuse of discretion to decline to enforce the claimed attorney's lien because Lego's evidence that O'Neal was his client for whom he rendered legal services on the joint collection project was insufficient and unpersuasive.

_____

[4]Enforcement of an attorney's lien is a form of equitable relief. *See In re Marriage of Rosenberg*, 690 P.2d 1293, 1294 (Colo. Ct. App. 1984).

Lego's argument on this issue is an unusual one. He does not contend, for example, that he was retained to represent O'Neal on issues ancillary to O'Neal's representation of the plaintiff class. Instead, Lego contends that he was retained to assist O'Neal in the latter's representation of the class and that he functioned as a temporary contract lawyer for O'Neal. His argument that such a relationship results in O'Neal having been his client is based entirely on dictum in *Lathrop v. Hallett*, 77 P. 1095 (Colo. Ct. App. 1904).

In *Lathrop*, an attorney, Mr. Kingsley, was employed by the executor of an estate to defend an action contesting the will. Kingsley employed another attorney, the appellant Lathrop, to assist him in the matter. The defense was successful, but Mr. Kingsley failed to compensate Ms. Lathrop for her services. Lathrop then brought a separate action against the executor (and a beneficiary), attempting to assert an attorney's lien against the estate to obtain payment of her fees. Relief was denied and attorney Lathrop appealed. The appellate court held that although Kingsley, the attorney retained by the executor, could retain Lathrop *at his own expense* to assist in the case, the attorney did not have the authority to employ Lathrop at the expense of his client, the executor. The appellate court went on to hold that Lathrop's recourse was against Kingsley, the attorney who had hired her, and not against Kingsley's client, the executor.

In the course of its discussion to this effect, however, the *Lathrop* court made one passing reference to the primary attorney, Kingsley, as the "client" of the attorney whom he hired to assist him. This portion of the opinion is obviously dictum, as the district judge

- 17 -

noted. We agree with the district judge that this earlier dictum from the intermediate appellate court is not convincing on the current state of Colorado law.[5] As a general rule, we give deferential consideration to both the "holdings and the considered dicta of the State Courts." *Colorado Visionary Academy v. Medtronic, Inc.*, 397 F.3d 867, 871 (10th Cir. 2005). The almost casual use of the term "client" in *Lathrop*, however, was not accompanied by any discussion of the import of the use of the term nor by any other indication that the usage was "considered." We are not aware of a single other authority that supports Lego's position that an attorney who hires another attorney to assist on a project is the client of his hireling. We believe that the notion is fundamentally contrary to the general understanding of bench and bar. We therefore conclude that we are not bound by the *Lathrop* dictum: "The dictum of an intermediate state court is weak authority at best, *especially when it is an unelaborated hint that if taken seriously would be contrary to settled doctrine that the court does not discuss.*" *Sutton v. A. O. Smith Co.*, 165 F.3d 561, 564 (7th Cir. 1999) (emphasis added); *see also Manalis Finance Co. v. United States*, 611 F.2d 1270, 1272-73 (9th Cir. 1980); *Infomax Office Systems v. MBO Binder & Co.*, 976 F.Supp. 1247, 1252 (S.D. Iowa 1997).

---

[5]It is well established that state law applies to this issue. *Donaldson, Hoffman & Goldstein v. Gaudio*, 260 F.2d 333 (10th Cir. 1958). Both parties assume that Colorado law should govern, and we thus do not address whether the state of performance might have been Florida, nor whether its law should instead apply. *See Democratic Central Comm. v. Washington Met. Area Transit Commission*, 941 F.2d 1217, 1219 (D.C. 1991) ("existence and effect of an attorney's lien" is governed by the law of the place of performance).

We note authorities from other jurisdictions do not support Lego's reliance on a literal reading of the *Lathrop* dictum. *See Democratic Central Comm. v. Washington Met. Area Transit Commission*, 941 F.2d 1217, 1219-20 (D.C. 1991); *Harvey L. Lerer, Inc. v. Eighth Judicial Dist. Court*, 901 P.2d 643, 646 (Nev. 1995). The general rule is that a temporary or contract lawyer "who performs legal services for or on behalf of clients of the firm is subject to duties to the firm's clients similar to those of lawyers generally, such as those of competence and diligence . . . and confidentiality . . . ." *Restatement (Third) of the Law Governing Lawyers* § 9, comment *g* (2000). A lawyer not regularly in practice with a firm *may* be hired to provide services to the firm as his client, *id.*, but again Lego does not contend that he was performing services for O'Neal that were distinguishable in nature from the services that O'Neal was providing for the plaintiff class. Instead, he simply relies on *Lathrop* as establishing his contention that a temporary lawyer who works *on the clients' project* in the assistance of another lawyer is in an attorney-client relationship with that lawyer. We are not aware of any authority other than the *Lathrop* dictum that supports this argument. Like the district judge, we are not persuaded by the argument that this is the rule in Colorado.

Furthermore, we need not base our decision in this case wholly on our view that the *Lathrop* dictum is not controlling. Assuming *arguendo* that the dictum is controlling, and thus that O'Neal was Lego's client (which would, we believe, be contrary to the law generally prevailing in other states), we still conclude that the district judge did not abuse his

discretion in refusing to enforce an attorney's lien in this case. Lego's admissions that he was working on the joint collection project as a temporary attorney for O'Neal shows that he was attempting to do indirectly that which he could not have done directly, namely to represent the plaintiffs against Siemer in the same litigation in which he had previously represented Siemer.

The district judge specifically said that he would not have, and believed that he could not have, approved such an arrangement had it been proposed to him. Yet, Mr. Lego offered his services for the benefit of the plaintiff class, without the court's approval, and then turned to the same court to seek equitable relief in the form of enforcement of an attorney's lien. We hold that the district judge was clearly within the scope of his discretion in refusing to permit this maneuver.

In sum, Lego's argument that O'Neal was his client for the services Lego rendered in connection with the joint collection project is untenable. The district court therefore clearly was correct to strike the notice of attorney's lien as to that portion of the work Lego performed.

**VI**

Analysis in the context of the fee dispute project is necessarily different in that it is apparent that the efforts of Lego and O'Neal were not for the benefit of the plaintiff class. Work that Lego did on this project was directly for the benefit of O'Neal (and also for himself since he expected to be compensated by O'Neal). This by itself, however, is

insufficient to establish that O'Neal was Lego's client. It is common for lawyers to join forces in projects, whether they are in the same law firm or not, but it is not usually the case in such arrangements that one attorney is the client of another. Nor is the fact that the project involves resolution of a fee dispute sufficient by itself to convert what had been a collaborative effort by two lawyers into an attorney-client relationship.

The district court held that the evidence of an attorney-client relationship was insufficient. The court noted that Lego claimed entitlement to the "princely sum" of $302,975.63 for the fee dispute project, although apparently the judge viewed the request as really for some $70,000 less because Lego had (for reasons unknown) included fees claimed by Mr. Hoffman. This sum was allegedly due under an oral agreement.

The district judge cited the failure to reduce the agreement to writing as a factor raising doubt as to the existence of the alleged agreement. The judge said that this concern was acute because of the amount of fees claimed and the fact that this project was itself a dispute over legal fees. Lego contends that the failure to reduce the terms to writing should not be of concern because he and O'Neal operated in an atmosphere of trust and confidence.

Lego's response does little to alleviate the concern expressed by the district judge. We may accept that Lego and O'Neal did indeed operate in an atmosphere of trust and confidence in the beginning of their relationship, but the timing of the alleged oral agreement in the context of their relationship raises very serious doubts about Lego's representations. Lego says that the oral agreement was reached in March 2000. Just weeks earlier, in

February 2000, O'Neal had purported to terminate his relationship, whatever it was, with Lego by sending him a memorandum. In this memo O'Neal made a number of statements that Lego insists were incorrect and which O'Neal later retracted in a missive explaining that later conversations with Lego had refreshed his recollection so that he realized his previous statements were inaccurate.[6] These statements included several references to their supposed agreement to share O'Neal's anticipated portion of the contingency fee that the Co-Counsel Agreement provided for. Lego has since vigorously denied that there ever was such an agreement. We need not (and indeed, are not equipped to) delve into this dispute to determine if there had been such an understanding. We share the concern and the skepticism of the district judge that two experienced attorneys, who were enmeshed in a high stakes and very contentious fee dispute and who had just come to realize that they had widely different views of the terms of the oral agreement under which they had been operating, would come to a new agreement and would decide not to put its terms in writing.

Additionally, it is still unclear just what the terms of the alleged agreement are. In the memo allegedly memorializing the two attorneys' agreement on the joint collection project (executed nearly two years after the two allegedly began working under an oral agreement), it was left to O'Neal's discretion to determine the hourly rate at which he would compensate Lego and to determine what was a reasonable number of hours for Lego to have expended. The purported oral agreement for Lego to represent O'Neal in the fee dispute project lacks

---

[6]No doubt these were among the inconsistencies that led the district judge to conclude that neither party to this dispute was fully credible.

- 22 -

even this specificity. Thus, while Lego's calculations presumably are based on an hourly rate, we are not informed what that rate is, how it was determined, or by whom it was determined.

The district judge also cited the paucity of evidence in the record to support the contention that Lego had spent such a substantial number of hours as O'Neal's attorney and the lack of evidence in the record to support the contention that he had acted as O'Neal's attorney at all. Lego admits that he did not submit any pleadings or other papers to the court in his name as O'Neal's attorney but asserts that his role simply did not require that. But as the court pointed out, before Hoffman was retained, O'Neal filed some papers in the fee dispute in his name. Because Lego was admitted to practice before the district court and O'Neal was not, it is indeed strange that such papers would have been filed in O'Neal's name if Lego truly were acting as O'Neal's attorney.

Lego also contends that the record supports his position because he did appear in court on a few occasions. Like the district court, however, we are troubled by the statements by Lego made at these few court appearances shown in the record. Most telling, in one appearance Lego informed the court that O'Neal had retained counsel to represent him in the fee dispute and that counsel was Mr. Hoffman. On other occasions Lego identified himself as O'Neal's associate.

Not only does this record evidence cast severe doubt on Lego's position, but the last mentioned incident raises the question whether Lego's position on his capacity is the same

with respect to the fee dispute project as it is on the joint collection project. As we noted, Lego does not maintain in this court (and as far as we can determine did not in the district court) that his work on the joint collection project was materially different from the work an associate at a law firm might do at the direction of a partner of the firm. Instead, Lego argued that because he was a temporarily retained attorney not of the same firm, Colorado law as stated in *Lathrop* viewed O'Neal as his client. As to the fee dispute project, Lego similarly has offered nothing that justifies treating the relationship as a true attorney-client relationship, as opposed to simply two attorneys who had joined forces in a common project.

As a result, we again conclude that the district judge did not abuse his discretion in declining to afford equitable relief. Lego's evidence of the existence of an attorney-client relationship was insufficient and unpersuasive.

## VII

We need not address other contentions made in the briefs. Nor need we separately address Lego's claim for *quantum meruit* recovery. Under that equitable theory it is still necessary to establish that the legal work was performed for a client in order for the statutory attorney's lien to be available, as is evident from the language of the attorney's lien statute. The statute provides for an attorney's lien to secure payment for "any fees or balance of fees due or to become due *from any client.*" Colo. Rev. Stat. § 12-5-119 (emphasis added).

The evidence of an attorney-client relationship was insufficient to support Mr. Lego's notice of lien under any theory, and the district court did not abuse its discretion by failing

to specify that the *quantum meruit* claim failed on this basis, along with the other claims. We emphasize that we decide only that the district court did not abuse its discretion in declining to enforce an attorney's lien. Our study of the record shows that Mr. O'Neal has several times affirmed that he had some relationship with Mr. Lego in which Mr. Lego performed legal services with the expectation and understanding that he would be paid therefor by Mr. O'Neal. We offer no opinion on the validity or enforceability of any other claims that Mr. Lego may have.

The judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge